T.C. Memo. 2010-43

UNITED STATES TAX COURT

GREGG BARTL AND BETH FEINSTEIN-BARTL, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 22866-07L.                    Filed March 4, 2010.

<u>John M. Weinberg</u>, for petitioners.

<u>Christine K. Lane</u>, for respondent.

MEMORANDUM OPINION

LARO, <u>Judge</u>:  Petitioners petitioned the Court under section
6330(d)[1] to review the determination of the Internal Revenue
Service's Office of Appeals (Appeals) sustaining the

---

[1]Unless otherwise indicated, section references are to the
applicable version of the Internal Revenue Code.  Some dollar
amounts are rounded.

Commissioner's filing of a notice of Federal tax lien relating to $83,755 of Federal income taxes owed by petitioners for 2000 through 2005 (subject years). Petitioners argue that Appeals was required to accept their offer of $50,000 to compromise the $83,755 liability. We decide whether Appeals abused its discretion in declining the offer and in sustaining the filing of the notice of Federal tax lien. We hold it did not.

## Background

The parties' stipulations of fact and accompanying exhibits are incorporated herein by this reference. The stipulated facts are so found.

I.  Petitioners

A.  Overview

Petitioners are husband and wife. Gregg Bartl (Mr. Bartl) is a carpenter. Beth Feinstein-Bartl (Ms. Feinstein-Bartl) is a freelance reporter and a retail sales associate. Petitioners resided in Florida when the petition was filed.

B.  Petitioners' Health Issues

1.  Mr. Bartl

Mr. Bartl was born in 1961. He suffers from hypertension and depression and has had two mild strokes, neither of which was detected or treated at the time of occurrence. Mr. Bartl received medical treatment for those conditions, but he did not

have health insurance.  He incurred $5,970 in unreimbursed medical expenses from the treatment.

Mr. Bartl earned no income from 1999 to 2003.  He earned $3,436 of income in 2004 and $37,184 of income in 2005.  The 2005 increase in income was attributable to his securing fulltime employment as a carpenter.

### 2.  Ms. Feinstein-Bartl

Ms. Feinstein-Bartl was born in 1959.  She was diagnosed with fibroid tumors of the reproductive tract in 2003, which she fully recovered from in August 2004.  The treatment of the tumors caused petitioners to incur medical expenses because, even though Ms. Feinstein-Bartl had health insurance, her insurance company deemed the tumors to be a preexisting condition not covered by her policy.[2]

Ms. Feinstein-Bartl's income has gradually decreased over time.  She earned $34,599 in 1999, $33,376 in 2000, $30,029 in 2001, $29,970 in 2002, $26,545 in 2003, $23,122 in 2004, and $22,577 in 2005.

### 3.   Petitioners' Psychological Evaluation

On October 6, 2005, petitioners underwent a joint psychological evaluation at the advice of their counsel, John M.

---

[2]The extent of her medical expenses is not discernible from the record.

Weinberg (Mr. Weinberg).  The psychologist opined that petitioners suffered from stress and depression.

II.  Nonpayment of Tax and Notice of Federal Tax Lien

Petitioners filed Federal income tax returns for the subject years but did not pay the resulting tax liabilities.  On December 26, 2006, respondent mailed to petitioners a Notice of Federal Tax Lien Filing and Your Right to a Hearing.  The notice advised petitioners (i) that respondent had filed a notice of Federal tax lien related to their Federal income taxes for the subject years; and (ii) of their right to a hearing with Appeals to review the propriety of that action.

III. Offers-in-Compromise

A.  Overview

Petitioners submitted two offers seeking to compromise their tax liabilities.

B.  First Offer

1.  Overview

On June 7, 2006, respondent received petitioners' Form 656, Offer in Compromise (first offer), in which petitioners agreed to pay $17,500 to satisfy their outstanding tax liabilities for the subject years as well as for 1997 through 1999.  Petitioners afterwards revised the first offer to assert doubt as to

collectibility and effective tax administration as the reasons for the offer.[3]

    2.    <u>Respondent's Evaluation of the First Offer</u>

        a.    <u>Overview</u>

On November 17, 2006, respondent determined that he could expect to collect $308,285 from petitioners over a 10-year period. The $308,285 was based on $183,800 in net realizable equity from current assets, $47,445 in retired debt, and $77,040 in future income (i.e., total income less necessary living expenses, each of which is summarized below). Respondent's determination was derived from information petitioners tendered on Form 433-A, Collection Information Statement for Wage Earners and Self-Employed Individuals.

        b.    <u>Net Realizable Equity</u>

            i.    <u>Real Property</u>

              1)    <u>Overview</u>

Petitioners reported various assets and liabilities on Form 433-A. Included in the assets were a primary residence and rental property, each located in Florida.

---

[3]The first offer initially asserted doubt as to liability as the reason for compromise. On June 26, 2006, respondent received petitioners' revised offer-in-compromise, which removed doubt as to liability as the reason for compromise and substituted doubt as to collectibility and effective tax administration. The original and revised offers were otherwise unchanged. We refer collectively to the first offer dated June 11, 2006, and the revised offer dated June 26, 2006, as the "first offer".

## 2)   Primary Residence

The primary residence is a 1,117-square-foot ranch-style home built in 1963 that sits on a 6,135-square-foot lot.  The home has two bedrooms and one bathroom and was appraised by a third party in connection with this proceeding.  Although comparable homes ranged in value from $187,000 to $239,000, the primary residence was valued at $125,000 because of its general unsuitability as compared to other homes.  Respondent concedes that the value of the home before encumbrances is no greater than $125,000.

Respondent determined petitioners' net realizable equity in the primary residence to be $90,396.  In arriving at this amount respondent discounted the $125,000 value of the primary residence by 20 percent ($125,000 x 80% = $100,000) and then subtracted a $9,604 primary mortgage held by Bank of America, N.A. (Bank of America primary mortgage).  Petitioners contend that the primary residence also is subject to other encumbrances which respondent did not take into account.  Petitioners state that these other encumbrances include a $50,000 mortgage (Reich mortgage) held by Corine Reich (Ms. Reich), Ms. Feinstein-Bartl's mother,[4] and a

---

[4]Petitioners support the Reich mortgage with a mortgage deed dated Oct. 18, 2006, which was recorded with Broward County on Oct. 20, 2006.  That mortgage calls for monthly payments of $277.78 and a maturity date of Oct. 18, 2021.  The mortgage states that it does not bear interest, and the total payments equal $41,667 over the life of the mortgage, which is $8,333 less
(continued...)

$55,000 home equity line of credit with Bank of America (Bank of America home equity line) that was advanced to petitioners in April 2007. The Bank of America home equity line was secured by petitioners' primary residence.

### 3)   Rental Property

Petitioners also provided to respondent an independent appraisal of the rental property. Built in 1962, the rental property is a ranch-style home of approximately 1,000 square feet that sits on a 6,135-square-foot lot. The rental property has three bedrooms and 1.5 bathrooms, with comparable homes ranging in value from $155,000 to $187,000. The rental property was appraised at $115,000, and respondent has accepted that appraised value. The rental property is not subject to any encumbrances. Respondent discounted the rental property by 20 percent and determined net realizable equity to be $92,000 ($115,000 x 80%).

### ii.   Vehicles

Petitioners owned three vehicles. First, petitioners owned a 1988 Chevrolet S10 pickup truck which respondent determined would yield $240 in net realizable equity. Second, petitioners owned a 1998 Chevrolet Blazer which respondent determined would

---

[4](...continued)
than the face amount of the mortgage. On Jan. 19, 2007, Ms. Reich drafted a letter to petitioners in which she threatened to foreclose on petitioners' primary residence in repayment of the mortgage. The record does not indicate whether any such foreclosure action was initiated.

yield $240 in net realizable equity. Third, petitioners owned a 2003 Chevrolet S10 pickup truck (2003 Chevrolet) subject to a $20,907 loan. Respondent valued the 2003 Chevrolet at $16,000 for quick sale and recognized that net realizable equity would be zero because the amount realized from the sale ($16,000) would be less than the car loan ($20,907).

Petitioners also drove a Kia, the model, year, and value of which are not clear from the record. Ms. Feinstein-Bartl sends monthly payments of $230 to her mother (Ms. Reich) for petitioners' use of the Kia. Respondent did not attribute to petitioners any realizable equity as to the Kia.

### iii. Personal Effects

Petitioners reported $1,250 in other assets, including furniture, artwork, jewelry, clothing, and tools used in Mr. Bartl's carpentry business. Respondent determined that no realizable equity would inure from these personal items.

### c. Retired Debt

Respondent also determined as to the vehicles that petitioners would realize $47,445 in future income from "retired debt". Retired debt is debt that was included as a "necessary living expense" in the calculation of "future income" as if it would be paid throughout the 10-year period underlying the calculation, but which will not actually be paid throughout that period because it will be paid off earlier. See generally Lloyd

v. Commissioner, T.C. Memo. 2008-15. Respondent calculated future income debt relief as equal to the monthly payment allowable under the Internal Revenue Manual (IRM) multiplied by the difference between 120 months (10 years) and the number of months remaining on the automobile loans. Respondent determined total future debt relief to equal $23,550, attributable to the early retirement of the 2003 Chevrolet and $23,895 attributable to the early retirement of the Kia.

d. Future Income

1) Income and Expenses for Living Expenses

On November 17, 2006, respondent performed an analysis of petitioners' future income and living expenses as reported on Form 433-A and adjusted those expenses within respondent's guidelines. Respondent determined that petitioners' future income potential was $77,040, calculated as follows:[5]

| Income | Amount Claimed | Amount Determined |
|---|---|---|
| Wages and salaries | $3,099 | $3,050 |
| Net business income | -0- | 1,970 |
| Total | 3,099 | 5,020 |

| Expenses | Amount Claimed | Amount Allowed |
|---|---|---|
| Housing and utilities | $1,182 | $1,182 |
| Food, clothing, and misc. | 767 | 904 |
| Transportation | 1,666 | 1,132 |
| Health care | 492 | 492 |
| Taxes | 668 | 668 |
| Total | 4,774 | 4,377 |

---

[5]The sum of individual expenses does not equal the total expenses because of rounding.

The differences between petitioners' and respondent's determinations existed because respondent (i) disallowed a portion of petitioners' $1,666 in transportation expenses as excessive; (ii) adjusted certain items as prescribed by the IRM; and (iii) determined income to be higher than petitioners reported.  As to the latter, respondent calculated petitioners' future income using petitioners' combined earned income for 2005; i.e., the income earned by both Mr. Bartl and Ms. Feinstein-Bartl.  Petitioners, on the other hand, apparently calculated future income using only Mr. Bartl's income from 2005 ($37,184 divided by 12 months).  Petitioners apparently ignored Ms. Feinstein-Bartl's salary in their income calculation.  Petitioners' omission of Ms. Feinstein-Bartl's portion of income yielded a lower future income than respondent calculated.

Respondent concluded that petitioners' monthly gross income and their monthly living expenses resulted in a monthly surplus of $642 ($5,020 - $4,377), the proceeds of which respondent treated as available for petitioners to satisfy their outstanding tax liabilities.  Respondent calculated that this surplus would arm petitioners with an additional $77,040 over the 10-year base period ($642 x 12 months x 10 years).

2)  Other Liabilities Proffered by Petitioners

In the stipulations of fact petitioners present documentation of additional liabilities which were neither

reported on Form 433-A nor included in respondent's calculation. First, Mr. Bartl owes the State of New Jersey $3,226 for past-due automobile insurance surcharges. Second, Mr. Bartl owes certain medical expenses, including: (i) $4,183 to Memorial Regional Hospital; (ii) $573 to Inphynet South Broward, Inc.; and (iii) $607 to an unnamed creditor.[6]

### e. Result of First Offer

On January 4, 2007, respondent rejected the first offer because the amount offered ($17,500) was less than petitioners' reasonable collection potential ($308,285). In the rejection respondent noted that he considered petitioners' "special circumstances" but those circumstances did not warrant acceptance of the first offer. Respondent invited petitioners to submit additional information in support of their position if they desired.

Petitioners filed Form 12153, Request for a Collection Due Process Hearing (hearing), on January 12, 2007. Through that form petitioners sought a discharge of tax liens placed on their primary residence and rental property so that they might refinance their properties, purportedly to repay their outstanding tax liabilities.

---

[6]Mr. Bartl owed $5,970 in past-due medical expenses, but apparently $607 of that debt was forgiven.

C.   Second Offer

On January 21, 2007, petitioners tendered to respondent a second Form 656 (second offer) offering to compromise their outstanding tax liabilities.  The second offer increased the settlement amount to $50,000 to satisfy their outstanding tax liabilities for the subject years as well as for 1997 through 1999.  Petitioners again asserted doubt as to collectibility and effective tax administration as grounds for a compromise, but petitioners presented no updated financial information.  On February 1, 2007, respondent denied the second offer.

IV.  Hearing and Determination

Petitioners requested a face-to-face hearing to determine the merits of the rejected offers.  On August 8, 2007, David C. Varnerin (Mr. Varnerin), a settlement officer for Appeals, held a hearing with Mr. Weinberg.  Messrs. Varnerin and Weinberg discussed the rejection of petitioners' offers-in-compromise, but no other issues or collection alternatives were raised.  Mr. Varnerin took the position that petitioners had net equity in assets of $183,800 and future income of $124,485 ($77,040 in future income potential + $47,445 in retired debt relief), resulting in a reasonable collection potential of $308,285. Appeals was of the view that it was more appropriate to use petitioners' total income from 2005 rather than only Mr. Bartl's income because Ms. Feinstein-Bartl continued to publish articles

for two newspapers in Florida.[7]  Appeals determined that petitioners did not suffer any economic hardship because they were both employed and meeting basic living expenses.

Appeals also focused on petitioners' ownership of two pieces of real estate as a reason for rejecting the offers.  In examining respondent's calculation of petitioners' net realizable equity, Appeals accounted for the existence of additional encumbrances, but determined that the net realizable equity still exceeded petitioners' tax liabilities.  Appeals also recognized that although the rental property had fallen somewhat into disarray, there was no need to discount the value of the rental property further because the current occupant of the house, a friend of petitioners, was fixing up the house in exchange for rent.  Appeals indicated that either the proceeds from the sale of the rental property or the income which could be generated by renting the property was sufficient to satisfy petitioners' tax liabilities.  On September 17, 2007, Appeals sustained the rejection of petitioners' offers-in-compromise.

V.    Petition and Underlying Tax Liability

On October 5, 2007, petitioners petitioned the Court to determine whether Appeals abused its discretion by not accepting

---

[7]Appeals apparently located at least seven articles published during January and February 2007 in which Ms. Feinstein-Bartl's name appeared on the byline, indicating that despite petitioners' contrary assertions, Ms. Feinstein-Bartl was actually working.

petitioners' offers-in-compromise.  Petitioners did not contest the validity of the underlying tax liability at the hearing and similarly make no objection in the petition.

## Discussion

### I.   Overview

Petitioners argue that Appeals was required to let them pay $50,000 to compromise their $83,755 in Federal income tax liability on the basis of (i) doubt as to collectibility; and (ii) effective tax administration.  Our review is limited to those issues petitioners raised at the hearing.  See Giamelli v. Commissioner, 129 T.C. 107, 114 (2007).  At the hearing, petitioners raised only the appropriateness of their offers-in-compromise to be accepted.  Accordingly, we limit our analysis to the propriety of Appeals' rejection of petitioners' $50,000 offer-in-compromise, the higher of their two offers.

### II.  Standard of Review

Where, as here, petitioners' underlying tax liability is not at issue, we review the determination solely for abuse of discretion.  See Sego v. Commissioner, 114 T.C. 604, 610 (2000).  In deciding whether Appeals' rejection of an offer-in-compromise was an abuse of discretion, we decide whether the rejection was arbitrary, capricious, or without sound basis in fact or law.  See Cox v. Commissioner, 126 T.C. 237, 255 (2006), revd. 514 F.3d 1119 (10th Cir. 2008); Murphy v. Commissioner, 125 T.C. 301, 308

(2005), affd. 469 F.3d 27 (1st Cir. 2006); <u>Woodral v.
Commissioner</u>, 112 T.C. 19, 23 (1999).  We do not substitute our
judgment for that of Appeals, and we do not prescribe the amount
we believe would be an acceptable offer-in-compromise.  See
<u>Murphy v. Commissioner</u>, <u>supra</u> at 320; see also <u>Fowler v.
Commissioner</u>, T.C. Memo. 2004-163.

III. <u>Petitioners' Offers-in-Compromise</u>

    A.   <u>Overview</u>

A taxpayer may offer to compromise a Federal tax liability.
Sec. 7122; see also sec. 6330(c)(2)(A)(iii).  The Commissioner
has specified guidelines for determining when a taxpayer's offer-
in-compromise should be accepted.  See sec. 301.7122-1(b),
Proced. & Admin Regs.  These guidelines permit the Commissioner
to accept an offer-in-compromise on the following grounds:
"Doubt as to liability", "Doubt as to collectibility", and to
"Promote effective tax administration".  <u>Id.</u>  Petitioners argue
that Appeals was required to accept the compromise of their tax
liability on the latter two grounds.

    B.   <u>Doubt as to Collectibility</u>

        1.   <u>Overview</u>

Petitioners argue that Appeals abused its discretion in
failing to accept their $50,000 offer-in-compromise on the basis
of doubt as to collectibility because their "limited assets do

not enable them to pay their tax debt." We disagree that Appeals abused its discretion.

    2. No Abuse of Discretion in Rejecting Petitioners'
       Doubt as to Collectibility Claim

The guidelines for evaluating offers-in-compromise on the basis of doubt as to collectibility are set forth in regulations under section 7122. See sec. 301.7122-1(b)(2), (c)(2), Proced. & Admin. Regs.; see also IRM pt. 5.8.4.4 (Sept. 1, 2005). Under this guidance, the Commissioner may generally compromise a tax liability on the basis of doubt as to collectibility where the taxpayers' assets and income are less than the full liability. See sec. 301.7122-1(b)(2), Proced. & Admin. Regs. An offer-in-compromise based on doubt as to collectibility will be acceptable only if the offer reflects the taxpayer's reasonable collection potential (i.e., the amount less than the full liability that the Commissioner could collect through alternative remedies such as administrative and judicial proceedings). See Murphy v. Commissioner, supra at 309. A taxpayer's reasonable collection potential is determined, in part, using published guidelines that establish national and local allowances for necessary living expenses. Income and assets in excess of those needed for necessary living expenses are treated as available to satisfy Federal income tax liabilities. See IRM exhs. 5.15.1-3, 5.15.1-8, 5.15.1-9 (Jan. 1, 2005).

Before the hearing, petitioners submitted Form 433-A on which they set forth their income, expenses, assets, and liabilities.  Appeals reviewed petitioners' Form 433-A and adjusted petitioners' income, expenses, assets, and liabilities as prescribed by the IRM, determining that $308,285 could reasonably be collected from petitioners.  On that basis, Appeals determined that petitioners possessed sufficient assets and income to satisfy in full the subject tax debts owed to the Government.  Among the assets included by Appeals in its determination of petitioners' reasonable collection potential was the $92,000 in equity of petitioners' rental property.  We find no reason to disturb Appeals' reliance on the rental property equity as an asset available to satisfy petitioners' outstanding tax liabilities.[8]

3.  No Abuse of Discretion in Respect of the Bank of America Home Equity Line or the Reich Mortgage

Petitioners contend that Appeals failed to adjust their net realizable equity to include all encumbrances on the primary residence.  We do not agree.  Appeals noted in its report that even if petitioners' encumbrances were recognized, the net realizable equity ($183,800) less the encumbrances ($91,667) resulted in $92,133 in equity remaining to satisfy outstanding

_____

[8]On brief petitioners advance various arguments which were not raised at the hearing.  Since these arguments were not raised at the hearing, we decline to decide their validity.

tax liabilities.[9]  Appeals also considered whether the value of the rental property should be further reduced from its original $125,000 value to reflect (i) hurricane damage; and (ii) a generally depressed real estate market in South Florida.  Appeals determined that no further adjustment was necessary because the rental property could be either sold or rented and the proceeds from either of those prospects would be sufficient to satisfy petitioners' outstanding tax liabilities.

4.    Recalculation of Reasonable Collection Potential

Petitioners ask us to find that respondent should have adjusted their reasonable collection potential for the following items:  (1) Bank of America home equity line; (2) Reich mortgage; (3) $3,226 owed to the State of New Jersey; and (4) $5,363 to satisfy Mr. Bartl's unpaid medical expenses.  We note further that an additional amount for petitioners to satisfy the outstanding loan of $4,907 on the 2003 Chevrolet should have also been included in the calculation of petitioners' reasonable collection potential.  Even if Appeals took into account each of the above-mentioned items, however, petitioners still have

---

[9]We consider it reasonable for respondent to question whether the Reich mortgage constituted a bona fide indebtedness. The note calls for no interest and less than full repayment of principal, and the parties' intentions to be bound in a debtor-creditor relationship are questionable.  We further note that petitioners present no evidence that payments on the mortgage were made or enforceable.

$197,198 with which to satisfy their tax liabilities, calculated
as follows:

|  | Amount |
|---|---|
| **Net Realizable Equity** | |
| Value of primary residence (discounted) | $100,000 |
| Value of rental property (discounted) | 92,000 |
| Value of vehicles (for sale) | 480 |
| Less Bank of America primary mortgage | (9,604) |
| Less Reich mortgage | [1](41,667) |
| Less Bank of America home equity line | (55,000) |
| Total | 86,209 |
| **Retired Debt Relief** | 47,445 |
| **Future Income Potential** | 77,040 |
| **Miscellaneous Liabilities** | |
| State of New Jersey liabilities | 3,226 |
| Medical expenses | 5,363 |
| Balance on 2003 Chevrolet after sale | 4,907 |
| Total | 13,496 |
| **Reasonable Collection Potential** | |
| Net realizable equity | 86,209 |
| Retired debt relief | 47,445 |
| Future income potential | 77,040 |
| Less miscellaneous adjustments | (13,496) |
| Total | 197,198 |

[1]Although petitioners contend that respondent should have
accounted for the Reich mortgage as $50,000, the mortgage deed
only makes petitioners liable for $41,667.  We decline to find
that respondent should have accounted for any portion of the
Reich mortgage in excess of the amount petitioners were
personally liable.

Accordingly, even if we treat as fact all of petitioners'
assertions regarding the value of their assets and the

accompanying encumbrances, petitioners will still realize $197,198 with which to satisfy their tax liabilities.

     5.    Summary of Doubt as to Collectibility

Appeals' decision to reject petitioners' $50,000 offer-in-compromise was not arbitrary, capricious, or without a sound basis in fact or law, and it was not abusive or unfair to petitioners. The settlement officer's determination was based on a reasonable application of the guidelines which we decline to call into question. See Speltz v. Commissioner, 124 T.C. 165 (2005), affd. 454 F.3d 782 (8th Cir. 2006); Sullivan v. Commissioner, T.C. Memo. 2009-4.

    C.    Effective Tax Administration

     1.    Overview

The Commissioner may compromise a tax liability for promotion of effective tax administration where: (i) Collection in full, while achievable, would cause the taxpayer economic hardship; or (ii) compelling public policy or equity considerations provide a basis for compromising the liability. See Speltz v. Commissioner, supra at 172-173. Petitioners argue that their physical and psychological frailties coupled with an inability to maintain steady employment required Appeals to compromise their tax liability. We disagree.

## 2. Economic Hardship

Petitioners argue that Mr. Bartl's stroke and Ms. Feinstein-Bartl's tumors require that their $50,000 offer-in-compromise be accepted or else undue economic hardship will result. To this end, petitioners state that Appeals ignored their medical and psychological issues and that forcing the sale of their rental property would cause petitioners to be "homeless", turning them into "public charges". Section 301.6343-1(b)(4)(i), Proced. & Admin. Regs., states that economic hardship occurs when a taxpayer is "unable to pay his or her reasonable basic living expenses." Section 301.7122-1(c)(3), Proced. & Admin. Regs., sets forth factors to consider in evaluating whether collection of a tax liability would cause economic hardship, as well as some illustrative examples. One example involves a taxpayer who provides fulltime care to a dependent child with a serious long-term illness. A second example involves a retired taxpayer who would lack adequate means to pay his basic living expenses were his only asset, a retirement account, to be liquidated. A third example involves a disabled taxpayer with a fixed income and a modest home specially equipped to accommodate his disability, who is unable to borrow against his home because of his disability. See sec. 301.7122-1(c)(3)(iii), Proced. & Admin. Regs. Petitioners' situation is not comparable to that of the taxpayers described in the regulations--they own two homes, four

cars, and are easily meeting their basic living expenses.  See Speltz v. Commissioner, 454 F.3d at 786.  The record is clear that Appeals' settlement officer, in making his determination, took into account petitioners' claims of mental and employment difficulties.  We find those claims to be speculative such that Appeals was not required to arbitrarily decrease petitioners' income potential to reflect them.  See, e.g., Fargo v. Commissioner, 447 F.3d 706, 710 (9th Cir. 2006), affg. T.C. Memo. 2004-13.

As to petitioners' claim that sustaining the lien action against them would turn them into public charges, we note that even after the payment of their tax liabilities, petitioners will have a surplus of approximately $113,443 ($197,198 - $83,755) with which to continue to develop their funds for retirement.

Appeals' analysis took into account, inter alia, petitioners' $83,755 uncontested liability and petitioners' net realizable equity in the rental property of $92,000, an amount that exceeds by a considerable margin petitioners' offer of $50,000.  Appeals also examined articles published in South Florida newspapers in determining that Ms. Feinstein-Bartl continued to generate business income despite her contrary contentions.  We do not consider Appeals to have abused its discretion by rejecting petitioners' claim that they will suffer

economic hardship if required to pay more than their $50,000 offer.

### 3. Compelling Policy or Equity Considerations

Petitioners argue that their physical and mental illnesses entitle them to forgiveness of their tax liabilities as a matter of equity.  However, petitioners present no convincing argument that requiring them to pay more than $50,000 would undermine public confidence that tax laws are being administered fairly.[10] To the contrary, if Appeals accepted petitioners' proposal that they pay less than all of their tax liabilities and of their reasonable collection potential under the facts of this case, then taxpayers in similar situations who lose a job or suffer health issues, but dutifully pay their taxes, might lose confidence in a system that excuses others when they fail to comply.  See Sullivan v. Commissioner, supra.

## IV. Conclusion

Petitioners have not shown that Appeals' rejection of their $50,000 offer-in-compromise was arbitrary, capricious, or without sound basis in fact or law.  Accordingly, we hold that Appeals' determination was not an abuse of discretion.  In so holding, we

---

[10]Petitioners contend that requiring them to pay taxes while the Government provided assistance to businesses under the American Recovery and Reinvestment Act of 2009, Pub. L. 111-5, 123 Stat. 115, would undermine public confidence that U.S. tax law is being administered fairly.  We find no legal or factual basis which supports petitioners' argument.

express no opinion as to the amount of any compromise that petitioners could or should be required to pay, or that Appeals is required to accept.  The only issue before us is whether Appeals abused its discretion in refusing to accept petitioners' specific offer-in-compromise of $50,000.  See Speltz v. Commissioner, 124 T.C. at 179-180.

In reaching our decision, we have considered all arguments made, and to the extent that we have not specifically addressed them, we conclude that they are without merit.  To reflect the foregoing,

Decision will be entered

for respondent.